762 F.2d 1007
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
VERNON M. GLASER, ET AL., PLAINTIFFS-APPELLANTS, CROSS-APELLEES,
v.
MR. STEAK, INC., DEFENDANT-APPELLEE, CROSS-APPELLANT.
 NO. 83-3908, 84-3002
 United States Court of Appeals, Sixth Circuit.
 3/26/85
 
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
 BEFORE: MARTIN and KRUPANSKY, Circuit Judges; and BERTELSMAN, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiffs Vernon Glaser, Marjorie Glaser (Vernon's wife) and Mary Ann Glaser (Vernon's sister) ('the Glasers') appealed from a judgment rendered in favor of defendant Mr. Steak, Inc. ('Mr. Steak') in this breach of contract action. Mr. Steak also appealed from the denial of its counterclaim for damages.
 
 
 2
 On or about September 5, 1968, the Glasers purchased certain real property, described as lots 87, 88, 89, 102, 103, 104 and 105, located at 2501 South Wilmington Pike in Kettering, Ohio. At all times pertinent to this case, plaintiffs have continued to own this property. On February 6, 1970, the Glasers, as lessors, and Mr. Steak, as lessee, entered into a lease agreement. Under this contract, plaintiffs agreed to construct a restaurant according to Mr. Steak's specifications, and lease it, together with lots 87, 88, 89 and portions of lots 104 and 105, to Mr. Steak. Mr. Steak agreed to pay the Glasers a rental of $24,000 per year payable in monthly installments of $2,033.33. The lease term was for twenty years. Plaintiffs constructed the restaurant as required.
 
 
 3
 On October 23, 1970, Mr. Steak subleased the restaurant to Continental Foods of Ohio, Inc. ('Continental'), a Mr. Steak franchise. This sublease was permitted under the terms of the Mr. Steak--Glasers agreement.
 
 
 4
 In 1974, Edward Brown ('Brown') purchased all shares of Continental stock. He became president of the corporation as well as the operating manager of the Wilmington Pike Mr. Steak restaurant. In early 1975, a Mr. Steak franchise located at Linden and Woodman in Dayton, was offered for sale by defendant. Brown formed an Ohio corporation, Lindenwood Enterprises, Inc., which ultimately purchased the Linden Mr. Steak franchise.
 
 
 5
 During 1977, Brown desired to sever his relations with Mr. Steak and to continue the operation of the Linden and Wilmington restaurants under a different format with the name of 'Grandma Brown's'. Brown approached Vernon Glaser, seeking assistance to finance the conversion. Brown proposed that he would seek disenfranchisement from Mr. Steak, which was desirous of terminating its Dayton-area operations, and would then operated the Wilmington Pike and Linden establishment under the 'Grandma Brown's' format. Brown further suggested that if Glaser secured $150,000 to finance the project, Glaser would receive five percent of the annual gross sales of the two Grandma Brown's and three other pizza-type restaurants which Brown and his attorney, Jack Dawson, owned or controlled. Glaser would also receive a ten percent interest in the corporation which owned all five eateries. Although Glaser initially attempted to secure a commitment for the loan which Brown needed, Glaser refused participation in the venture for reasons not specified in the record.
 
 
 6
 Notwithstanding Brown's failure to obtain financing through Glaser, Brown continued to seek disenfranchisement from Mr. Steak in an effort to launch his own independent enterprises. To that end, Mr. Steak and Brown entered into a mutual release, which required Brown to secure a complete release of Mr. Steak from plaintiffs on the original lease covering the Wilmington Pike restaurant. The Glasers refused to execute the release.
 
 
 7
 Thereafter, Brown secured an alternative source of funding through a Small Business Association (SBA) loan. This permitted him to convert some of the restaurants to the 'Grandma Brown's' format.
 
 
 8
 In the spring of 1978, Brown once again approached Glaser for aid in financing his conversion scheme of the Wilmington Pike restaurant into a 'Grandma Brown's'. Glaser assisted Brown to secure a $45,000 loan. Glaser guaranteed the loan by placing a second mortgage on the Wilmington Pike premises. Brown used the money to pay off franchise fees that he owed Mr. Steak as well as expanding and converting the Wilmington Pike facility into the new format.
 
 
 9
 On May 26, 1978, the Glasers and Continental entered into an agreement styled 'Lease of Improvements', authorizing the construction of a 1,200 square foot addition to the Wilmington Pike restaurant to further Brown's conversion of the Mr. Steak to a Grandma Brown's. The agreement obligated Continental to pay plaintiffs a total of $56,704.80 rent in sixty equal, monthly installments of $945.08 for the additional space. Glasers required Brown to execute the improvements agreement personally as well as in his corporate capacity as president of Continental.
 
 
 10
 When city officials became aware of the new construction at the site, the city notified Brown that he would need zoning approval before the construction could proceed since the Glasers had erected the original building pursuant to a special use zoning permit. Brown initiated the rezoning action but the delay resulted in financial hardship and 'money got tight.' Brown, who was utilizing part of the Wilmington Pike location as his central office at that time, related that the Glasers 'got nervous' regarding the financial status of Continental, and locked Brown out of his office and refused his requests to re-enter. Glaser's contrary testimony was that in September, 1978, he discovered the Wilmington Pike restaurant abandoned with the alterations incomplete.
 
 
 11
 After meeting its financial obligations under its lease through August, 1978, Mr. Steak ceased paying rent to the Glasers. In a letter from Mr. Steak's legal counsel, James E. Cross, dated October 2, 1978, the Glasers were notified that Mr. Steak considered them in breach of the lease due to (1) 'the major alterations in the premises which have taken place in recent months, without the prior approval of Mr. Steak, Inc.,' and (2) 'because these alterations . . . have remained incomplete for an extended period of time, render[ing] the premises untenable for restaurant purposes.' While noting that Mr. Steak's 'firm position' was that the Glasers' breach effectively terminated the lease, Cross reminded the Glasers of their legal obligation to mitigate any potential damages by re-renting the premises. Cross further informed the Glasers that he had spoken with a principal in Sunday Cooking, Inc., who indicated an interest in leasing the premises.
 
 
 12
 On September 5, 1979, the Glasers filed a complaint against Mr. Steak wherein they alleged that while '[t]he Glasers have performed all of their covenants and obligations in accordance with the lease,' 'Mr. Steak has willfully breached its lease agreement with the Glasers by, among other things, defaulting on its obligation to pay rent; failure to pay maintenance costs as required by the lease; and failure to pay utilities, water and tax obligations as required by the lease.' The Glasers prayed for damage in excess of $150,000.
 
 
 13
 Mr. Steak's answer and counterclaim for alleged overpayment were not included in the record. However, in Mr. Steak's post trial brief, defendant argued that it was entitled to a refund of $1,015 for insurance premiums and $1,623.83 for real estate taxes paid on the Wilmington Pike premises after the alleged August, 1978 breach by plaintiffs.
 
 
 14
 On November 18, 1983, the trial judge issued an opinion wherein he held that the Glasers had not technically breached the express terms of the lease, but further concluded that the lease between Mr. Steak and the Glasers terminated by operation of law as a result of the extensive renovations undertaken by Brown and approved by the Glasers. Thus, the court ruled, Mr. Steak was absolved from its obligation to pay rent as of August, 1978. However, the court further concluded that Mr. Steak was not entitled to a favorable judgment on its crossclaim because it failed to provide evidence as to the exact amount of overpayments. Both parties filed timely appeals in this court.
 
 
 15
 Since this court's jurisdiction over the instant appeal is founded in diversity, the law of Ohio is dispositive. Erie Railroad Co. v. Thompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). A thorough review of that state's jurisprudence discloses that Ohio recognizes at least two situations wherein a lessee who has subleased the premises can be absolved from liability to the lessor. One such circumstance occurs when the prime lessor expressly agrees to release the prime lessee. City National Bank & Trust Co. v. Swain, 29 Ohio L.Abs. 16, 25 (Ohio App. 1939). This rule is not dispositive of the appeal at bar, because the Glasers specifically refused to release Mr. Steak from its lease when a release was requested on its behalf by Brown. The second situation arises where the conduct of the lessor and the sublessee[1] is such that it results in substantial modifications to the conditions of the master lease. Swain, supra, 29 Ohio L.Abs. at 28. Thus, if the prime lessee is burdened by the modifications, while consequently receiving no benefit therefrom, the original lease is terminated by operation of law.
 
 
 16
 In the case at bar, the district court held that the renovations of the Wilmington Pike premises, undertaken by Brown with the approval of the Glasers, imposed an additional burden on Mr. Steak not contemplated in the master lease. More specifically, the court below stated that 'it is reasonable to infer' that taxes, utilities and insurance which Mr. Steak was obligated to pay under the terms of the master lease would increase as a result of the construction of the additional space to be attached to the existing premises. The court also determined that Mr. Steak inured no benefit from Brown's undertaking to convert to a Grandma Brown's format which resulted in the Wilmington Pike alterations. The trial court thus concluded that the master lease terminated by operation of law, thereby releasing Mr. Steak from all further obligations under the lease as of August, 1978.
 
 
 17
 However, this appellate review finds no factual support in the record for the trial court's conclusions. To the contrary, absolutely no documentation was submitted by either party which would permit the district court to conclude that post-renovation taxes, insurance and utility costs would be the burden of Mr. Steak. To the contrary, pursuant to Article 7 of the Lease of Improvements, additional taxes, utilities and insurance, if any, resulting from the newly constructed addition and renovations were to be paid by Continental.
 
 
 18
 Moreover, in light of Mr. Steak's repeated expressed desire to cease its business operation at the Wilmington Pike location as well as in the entire Dayton area, together with its overt act of releasing Brown from his franchise commitment to pursue his Grandma Brown's restaurant, patently indicated Mr. Steak's intention to mitigate its 20-year lease commitment to the Glasers by encouraging Brown to continue a restaurant enterprise with a hopefully viable new format. Thus it is apparent that Mr. Steak would have realized a very substantial benefit from a successful Grandma Brown's restaurant, in that Continental and Brown would have continued to satisfy the rental payments to Mr. Steak, which in turn would mitigate its financial obligation to the Glasers, for the remaining term of the master lease. In sum, the lower court's conclusion that the lease between the Glasers and Mr. Steak terminated by operation of law in August, 1978, was premised upon factual findings which were clearly erroneous and therefore must be reversed.
 
 
 19
 In view of the foregoing, the district court's denial of Mr. Steak's counterclaim is AFFIRMED and its decision in all other respects is hereby REVERSED and REMANDED for the determination of damages, if any.
 
 
 
 *
 Hon. William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 Although this court is cognizant of the distinction between the terms 'assignee' and 'sublessee,' see 33A O.Jur.2d, Landlord and Tenant, Sec. 249, it appears that the Swain court used the terms interchangeably